J-S10022-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| DAVID LEE SUMNEY | : | |
| | : | |
| Appellant | : | No. 471 WDA 2023 |

Appeal from the Judgment of Sentence Entered November 17, 2022
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0002776-2020

BEFORE: OLSON, J., KING, J., and LANE, J.

MEMORANDUM BY KING, J.:          **FILED: May 3, 2024**

Appellant, David Lee Sumney, appeals *nunc pro tunc* from the judgment of sentence entered in the Allegheny County Court of Common Pleas, following his guilty plea for third degree murder.[1] We affirm.

The relevant facts and procedural history of this case are as follows. The Commonwealth charged Appellant with one count each of criminal homicide, robbery, and abuse of corpse, and six counts of theft by unlawful taking in connection with the death of Appellant's mother. On August 17, 2022, Appellant pled guilty to third degree murder. The Commonwealth withdrew all remaining charges pursuant to the plea agreement. At the plea hearing, Appellant admitted to the following factual basis for his plea:

The Commonwealth would have called as a witness Ms.

---

[1] 18 Pa.C.S.A. § 2502(c).

Peggy Prosseda, … who would have testified that she and her sister, Ellen Micenko, … are the daughters of the victim, Margaret Sumney, [("Victim")] and they are both the stepsisters of [Appellant], who had a different biological father than [them].

Ms. Prosseda lived out of state at the time of the murder. [Ms.] Prosseda would have testified that [Victim]'s biological brother, John Shade, passed away around the date of Saturday, August 31, in the year 2019. And subsequent to receiving that information, Ms. Prosseda and other family members tried repeatedly to contact [Victim] to discuss [Mr.] Shade's death and the impending funeral arrangements.

[Ms.] Prosseda would have testified that multiple phone calls to [V]ictim went unanswered during the time period of August 31 through September 2, 2019, with [Appellant], often answering the household phone or his cellphone.

During these conversations with [Ms.] Prosseda, [Appellant] would claim that the victim was, … "sleeping" … and that [Victim] was already aware of the death of her brother[.]

[Ms.] Prosseda became increasingly concerned when she was unable to contact [V]ictim after multiple attempts. This concern was borne out of an awareness that [V]ictim suffered from multiple health problems and also [Appellant] had recently moved into [V]ictim's residence[.]

[Appellant]'s presence was of particular concern to family members as they were aware that [Appellant] had been accused of physically abusing [V]ictim in the past. This concern caused [Ms.] Prosseda to contact the South Fayette Police Department to conduct a welfare check around 11:00 a.m. on September 2, 2019.

\* \* \*

South Fayette police went to the residence multiple times, … and left the residence being unable to make contact with anyone inside the residence.

\* \* \*

With heightened concern for [V]ictim's well-being and having exhausted all other options, the South Fayette Police made forced entry into the residence at approximately 11:45 p.m. on September 2, 2019.

Sergeant Wesolek, Officer Sawyer Gray, and Officer Blocher … would have testified that they entered the residence to observe the home to be in disarray with noticeable blood smeared on the furniture and the walls of the residence. Upon ascending the stairs to the second floor, the police found the deceased remains of [Victim] in the bathtub of the main bathroom in the residence.

\* \* \*

Dr. W. Ashton Ennis, … a pathologist with the Allegheny County Office of the Medical Examiner, would have testified … that he performed the autopsy upon the remains of 67-year-old [Victim.] Dr. Ennis would have testified that [V]ictim suffered lacerations covering the entire scalp and that her face and body was also covered in contusions. More pathologically significant, however, was the multiple fractured ribs on both sides of the ribcage, including multiple fractures of each rib creating what the doctor would have testified and described as a flailed chest[.] This injury would have prevented [V]ictim from breathing.

Dr. Ennis would have testified that [V]ictim's spine was fractured with an associated injury to the spinal column which would have caused [V]ictim to be paralyzed from the waist down. Regarding the amount of force necessary to cause such an injury, Dr. Ennis would have testified that this injury is most usually seen in fatal automobile crashes. In terms of whether an implement was used in the attack, Dr. Ennis could not conclude nor exclude the possibility of an implement having been used. In conclusion, Dr. Ennis would have testified that the cause of death in this case was blunt force impact injuries of the head, neck, and torso and that the manner of death in this case was homicide.

Allegheny County Police detectives returned to the crime scene and executed a search warrant for the residence[.] … Police found and collected various receipts including Giant

Eagle receipts…. These receipts were dated for the date of purchase at August 29, 2019.

\*  \*  \*

The Commonwealth would have introduced video surveillance from the Giant Eagle store…. The video, which is date and time stamped September 1, 2019, at approximately 6:48 p.m., depicts [Appellant] entering the store and ultimately checking out…. Records related to the transaction would have showed that [Appellant] purchased a rotisserie chicken as well as several items of household cleaning products. Many of those same products were found at the crime scene by detectives. During the transaction, records show that [Appellant] used the Giant Eagle Advantage Card belonging to [Victim].

Detectives Thomas Foley, Steven Hitchings, … and Dale Canofari, … and others would have testified that they encountered and detained [Appellant] outside of Slater's Funeral Home … on September 4, 2019. Seen in plain view dangling from [Appellant]'s pocket was an item of jewelry later affirmatively identified by family members as belonging to [V]ictim.

[Appellant] was taken to the Allegheny County Police Headquarters for an interview. Also found on [Appellant]'s person was a debit card and blank checks bearing [Victim's] name … as well as a key card for a room at the Indigo Hotel…. Also seized was [Appellant]'s iPhone….

…A forensic download was performed [on Appellant's iPhone.] Found in the memory bank of the phone was dozens of photos depicting the beating death of [Victim]. The first photos in the series are time and date stamped August 30, 2019, at about 4:50 a.m. and depict the victim injured and in distress. As the photos chronologically progress according to the time stamps, they depict increasing injury sustained by [V]ictim. The last photographs where [V]ictim is arguably alive or conscious are time and date stamped August 30, 2019 at approximately 9:58 a.m. The remaining photos show [V]ictim either unconscious or deceased.

In between many of the photos of [V]ictim appear selfies of [Appellant] in which he photographed himself. Clearly seen in these photographs [is Appellant]'s face with blood smeared on his face and in one photograph giving a thumbs-up pose.

\* \* \*

…As part of the forensic analysis of the iPhone … was an audit of the web search history of [Appellant]'s phone. The following searches were part of that history[.] On August 30, 2019, at 11:11 a.m., [Appellant] used or entered the search term, … "How long does it take before a body starts to decompose?"…. On August 30, 2019, at 3:50 p.m., [Appellant] searched the term using the web browser, … "How long do you wait to dispose of a body?"… Other searches performed on the phone include one on August 30, 2019 where [Appellant] entered the following search into the web browser at 3:50 p.m. Searched was, … "How to keep a decomposing body from smelling."… On September 1, 2019, at 4:24 a.m., [Appellant] searched the following term, … "Do you drain a body before dismembering?"… On September 1, 2019, at 4:29 a.m., [Appellant] searched the following term, … "Best way to drain a body."….

(N.T. Guilty Plea Hearing, 8/17/22, at 6-23).

At the conclusion of the hearing, the trial court accepted Appellant's guilty plea as knowing, intelligent, and voluntary. The court conducted a sentencing hearing on November 17, 2022. Jack Vanchieri, an officer at the Allegheny County Jail, testified on Appellant's behalf. Mr. Vanchieri stated that in the approximately three years that Appellant has been at the county jail, Appellant has not had any formal disciplinary actions taken against him. Additionally, Appellant was selected to be a pod worker, which is a position given by the officers to individuals that they believe would not cause problems or violate rules.

Jennifer Lynn testified that she is employed by Foundation of Hope as the program director for the pre-release program at the Allegheny County Jail. The program offers inmates various classes, such as addiction recovery, anger management and spiritual foundation. Ms. Lynn became acquainted with Appellant when Appellant participated in the course. Throughout their interactions, Ms. Lynn observed that Appellant was always calm, polite and respectful to her, other staff and other inmates. He also started participating in Bible studies with other inmates.

Lawrence Guzzardi, a medical toxicologist, testified that he reviewed Appellant's medical history and Appellant was prescribed several psychotropic medications that would affect a person's mind. Appellant was prescribed Adderall, Diazepam, Citalopram, and Bupropion. Dr. Guzzardi further noted that the prescribed amount of Adderall was the highest he had ever seen. Additionally, Dr. Guzzardi learned from Appellant that he consumed alcohol for the two days immediately prior to and after the murder. Since he has been incarcerated, Appellant has stopped taking Adderall and no longer has access to alcohol. Dr. Guzzardi opined that if Appellant is carefully monitored with drug testing and alcohol monitors to ensure that he is not consuming alcohol or drugs, Appellant is likely to demonstrate good impulse control and otherwise act in a rational manner. On cross-examination, Dr. Guzzardi confirmed that if Appellant is given access to drugs and alcohol and chooses to abuse those substances, criminal recidivism is possible.

Appellant expressed remorse for his actions and apologized to his family for the hurt that he caused. Victim's daughter, two sisters, niece, and nephew gave victim impact statements. They each expressed their deep grief and anger over losing Victim and explained the lasting traumatic effect that Appellant's actions had on their family. Victim's daughter also informed the court that Victim had given Appellant a privileged life, paying for private school and tuition for George Washinton University. She further stated her belief that Appellant's violent actions were triggered by Victim telling Appellant to find a job. Following argument, the court sentenced Appellant to 20 to 40 years' incarceration.

On Monday, November 28, 2022, Appellant timely filed a post-sentence motion, which the court denied on January 9, 2023. On March 16, 2023, Appellant filed a petition for relief seeking to reinstate his direct appeal rights. On March 21, 2023, the court reinstated Appellant's appellate rights *nunc pro tunc*. Appellant filed a timely notice of appeal *nunc pro tunc* on April 20, 2023. On May 30, 2023, the court ordered Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal, and Appellant complied on June 20, 2023.

Appellant raises the following issue for our review:

> Whether the trial court abused its sentencing discretion by failing to apply all relevant sentencing criteria, including the protection of the public, the gravity of the offense, and [Appellant's] character and rehabilitative needs, as required by 42 Pa.C.S.A. § 9721(b)?

(Appellant's Brief at 5).

Appellant asserts that in fashioning the sentence, the court focused exclusively on the severity of the crime and the victim impact statements, while ignoring Appellant's rehabilitative needs. Appellant argues that although the court stated that it read the pre-sentence investigation report ("PSI"), the sentence imposed demonstrates that the court did not consider the mitigating factors contained therein. Specifically, Appellant claims the court did not give proper weight to the fact that Appellant had consumed a concoction of prescription medication and alcohol when he committed the crime and has since demonstrated good behavior while incarcerated. Appellant further contends that the court did not take into consideration Dr. Guzzardi's testimony that Appellant is capable of good impulse control and rational behavior if his alcohol and drug consumption is regulated and monitored. Appellant concludes that the court abused its sentencing discretion, and this Court should vacate the judgment of sentence. We disagree.

As presented, Appellant's claim challenges the discretionary aspects of sentencing. *See Commonwealth v. Clarke*, 70 A.3d 1281 (Pa.Super. 2013), *appeal denied*, 624 Pa. 671, 85 A.3d 481 (2014) (stating contention that court focused solely on serious nature of crime without adequately considering protection of public or defendant's rehabilitative needs concerns court's sentencing discretion); *Commonwealth v. Cruz-Centeno*, 668 A.2d 536 (Pa.Super. 1995), *appeal denied*, 544 Pa. 653, 676 A.2d 1195 (1996)

(explaining claim that court did not consider mitigating factors challenges discretionary aspects of sentencing).

"Challenges to the discretionary aspects of sentencing do not entitle an appellant to an appeal as of right." *Commonwealth v. Phillips*, 946 A.2d 103, 112 (Pa.Super. 2008), *cert. denied*, 556 U.S. 1264, 129 S.Ct. 2450, 174 L.Ed.2d 240 (2009). Prior to reaching the merits of a discretionary aspects of sentencing issue:

> [W]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

*Commonwealth v. Evans*, 901 A.2d 528, 533 (Pa.Super. 2006), *appeal denied*, 589 Pa. 727, 909 A.2d 303 (2006) (quoting *Commonwealth v. Hyland*, 875 A.2d 1175, 1183 (Pa.Super. 2005)).

When appealing the discretionary aspects of a sentence, an appellant must invoke this Court's jurisdiction by including in his brief a separate concise statement demonstrating a substantial question as to the appropriateness of the sentence under the Sentencing Code. *Commonwealth v. Mouzon*, 571 Pa. 419, 812 A.2d 617 (2002); Pa.R.A.P. 2119(f). "The requirement that an appellant separately set forth the reasons relied upon for allowance of appeal furthers the purpose evident in the Sentencing Code as a whole of limiting any

challenges to the trial court's evaluation of the multitude of factors impinging on the sentencing decision to **exceptional** cases." *Phillips, supra* at 112 (emphasis in original) (internal quotation marks omitted).

"The determination of what constitutes a substantial question must be evaluated on a case-by-case basis." *Commonwealth v. Anderson*, 830 A.2d 1013, 1018 (Pa.Super. 2003). "A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Commonwealth v. Caldwell*, 117 A.3d 763, 768 (Pa.Super. 2015) (*en banc*) (quoting *Commonwealth v. Prisk*, 13 A.3d 526, 533 (Pa.Super. 2011)).

This Court reviews discretionary sentencing challenges based on the following standard:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. An abuse of discretion is more than just an error in judgment and, on appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, bias or ill-will.

*Commonwealth v. McNabb*, 819 A.2d 54, 55 (Pa.Super. 2003) (quoting *Commonwealth v. Hess*, 745 A.2d 29, 30-31 (Pa.Super. 2000)).

Pursuant to Section 9721(b), "the court shall follow the general principle that the sentence imposed should call for confinement that is consistent with

the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S.A. § 9721(b). Additionally, "a court is required to consider the particular circumstances of the offense and the character of the defendant." *Commonwealth v. Griffin*, 804 A.2d 1, 10 (Pa.Super. 2002), *cert. denied*, 545 U.S. 1148, 125 S. Ct. 2984, 162 L.Ed.2d 902 (2005). "In particular, the court should refer to the defendant's prior criminal record, his age, personal characteristics and his potential for rehabilitation." *Id.*

> …Where the sentencing court had the benefit of a [PSI report], we can assume the sentencing court "was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." *Commonwealth v. Devers*, 519 Pa. 88, 101-02, 546 A.2d 12, 18 (1988). *See also Commonwealth v. Tirado*, 870 A.2d 362, 368 (Pa.Super. 2005) (stating if sentencing court has benefit of PSI, law expects court was aware of relevant information regarding defendant's character and weighed those considerations along with any mitigating factors).

*Commonwealth v. Moury*, 992 A.2d 162, 171 (Pa.Super. 2010).

Instantly, Appellant raised his sentencing issue in a timely post-sentence motion, filed a timely notice of appeal, and included in his appellate brief a Rule 2119(f) statement. Further, Appellant's assertion that the court exclusively focused on the seriousness of the crime and failed to weigh his rehabilitative needs and/or consider mitigating factors as required by Section 9721(b) arguably raises a substantial question. *See Commonwealth v.*

- 11 -

*Trimble*, 615 A.2d 48 (Pa.Super. 1992) (holding defendant's claim that court failed to consider factors set forth under Section 9721(b) and focused solely on seriousness of defendant's offense raised substantial question). Thus, we proceed to address the merits of Appellant's sentencing issue.

At the sentencing hearing, the court explained its sentencing rationale as follows:

> Now as to the sentence itself, the court has, consistent with my obligation, considered the sentencing guidelines which are made part of the record in this matter. I noted them earlier. The court has considered the presentence report which, in addition to [Appellant]'s statements today, reflects his statement of remorse and also the presentence report which has detailed the character of [Appellant], his prior criminal record such as it was or was not, his age, personal characteristics, his potential for rehabilitation as well as the testimony of Dr. Lawrence Guzzardi today, the psychiatrist, on his behalf, his positive adjustment in the Allegheny County Jail as reflected in the testimony of the jail personnel and the Hope program. The court notes that his plea of guilty is a consideration. Of course, that has to be taken in the context of the exposure [to a potential] first degree murder conviction and a less sentence, but, in any event, in light of the psychiatric testimony, the facts of the case seem to be an appropriate disposition as we have litigated previously.
>
> The court has also taken into account the factors articulated in the Section 9721(b) of the sentencing code, protection of the public, gravity of the offense as it relates to the impact on the victim, of course the surviving family members, and members of the community. The court notes in this instance that the court, obviously, has taken into account the [e]ffects on the extended family, the surviving family members[.] [N]oted earlier today [Victim] was a mother, a grandmother, a sister, an aunt, and a friend. Again, the 20-plus letters and testimony that I have heard and reviewed reflects what a wonderful person she was, caring and giving[.] [T]hat particularly reflected in [Appellant]'s

- 12 -

background, having been sent to one of the premiere prep schools in the area as well as the finest university in the eastern half of the states, George Washington University, through her efforts. In that regard there is no dispute as to her character, the impact that this has had on her surviving family members, the impact of the letters I received from her granddaughter, her niece, everybody[.] [I]t was just a very profound impact that her death will have and profound enduring emotion and psychological for all of those persons.

The court believes in this instance that the sentence I will impose reflects in what I've stated so far[.] [Additionally,] the circumstances of [Appellant]'s conduct before [Victim]'s death, his conduct during her death, during the incident itself, and his conduct in the aftermath of her suffering and dying, dictate the sentence … that will be imposed, in the context of everything I said. The fact of imprisoning her in her own home, the deception and the subterfuge that he exhibited in talking with Ms. Shade, her sister, during that [time], her sister frantically and other members trying to reach her to communicate during that course of time, the circumstances of [Appellant]'s conduct during the … the prolonged and tortuous path leading to [Victim]'s death[.] [T]he brutal beating, in effect, the paralyzing condition she was in [] her own home, the extreme disparity between the physical size, age, and prowess have to be taken into account. Finally, the circumstances of [Appellant]'s conduct in the aftermath of [Victim]'s death, leaving her body dead and dying in her own bathtub to die and decompose, … and then attempts to cover it up by going to the local Giant Eagle and buying bleach and other materials to clean it up. The final indignity of taking her own jewelry and using it to entice the attention of … female staff workers at the hotel. All of these factors, of course attempted to be explained in court by Dr. Guzzardi today but the period of several days, the malice that was exhibited by [Appellant] leaves the court to the conclusion that the only sentence that should be imposed is a maximum sentence allowed by law. He will be sentenced to count four for the murder to 20 to 40 years incarceration.

(N.T. Sentencing Hearing, 11/17/22 at 40-44).

The court not only stated that it read the PSI report but specifically

- 13 -

noted that it considered the mitigating factors contained therein. Specifically, the court stated that it considered Appellant's character, personal characteristics, prior criminal history, and expression of remorse. The court further acknowledged Dr. Guzzardi's testimony that Appellant's actions may have been fueled by the substances in his system at the time of the murder. Thus, the record belies Appellant's claim that the court failed to consider the mitigating factors contained within the PSI report. *See Moury, supra*.

Likewise, the record belies Appellant's claim that the court failed to consider Appellant's rehabilitative needs. Prior to Dr. Guzzardi's testimony, the Commonwealth objected, arguing that Dr. Guzzardi's proposed testimony was relevant only to the subject of diminished mental capacity which was irrelevant for purpose of sentencing. The court overruled the Commonwealth's objection, specifically stating, "there is also the sentencing factor 9721(b), the court has to consider the rehabilitative needs of [Appellant]." (N.T. Sentencing at 15). Thus, the record makes clear the court was aware of its duty to consider Appellant's rehabilitative needs and ensured that it had all necessary information to properly weigh the Section 9721(b) factors. Additionally, in explaining its sentencing rationale, the court specifically acknowledged Dr. Guzzardi's testimony regarding the substances that Appellant had consumed at the time of the murder and Appellant's potential for rehabilitation if his alcohol intake and medications were regulated and monitored. The court further acknowledged Mr. Vanchieri and Ms. Lynn's

testimony regarding Appellant's positive adjustments since he has been incarcerated.

The court explained its reasoning for imposing the maximum sentence despite its consideration of Appellant's rehabilitative potential. The court noted the brutal manner in which Appellant murdered his own mother, who by all accounts was loving and provided Appellant with many opportunities in life. The court further noted the malice demonstrated by Appellant's actions during the murder and thereafter, in taking photos and leaving her body to decompose in the bathtub. The court also considered the profound and lasting impact Appellant's actions had on the surviving family members. The court further heard testimony from Dr. Guzzardi that if Appellant had access to drugs and alcohol and chose to abuse them, there is a possibility of criminal recidivism. The record confirms the court considered Appellant's rehabilitative needs but ultimately determined that the severity of the crime and the need to protect the public warranted the maximum sentence. On this record, we see no reason to disrupt the court's sentencing discretion. *See McNabb, supra*. Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 05/03/2024